## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| ARTHUR J. ROCQUE, JR. et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )  2:18-cv-00256-JDL |
| | ) |
| ZETTY, LLC, a/k/a EDGECOMB | ) |
| BOAT WORKS et al., | ) |
| | ) |
| Defendants. | ) |

### ORDER ON DEFENDANTS' MOTION FOR
### PARTIAL SUMMARY JUDGMENT

In June 2016, Arthur and Carol Rocque's boat, the *M/V Against the Wind*, sank at its mooring in Edgecomb, Maine. In their complaint, the Rocques assert several claims against Defendant Zetty, LLC, doing business as Edgecomb Boat Works, and its managing member, Defendant Mitch Garey (collectively, "Edgecomb"), contending that the repair work Edgecomb performed on the vessel was deficient and caused the vessel to sink. Edgecomb moves for a partial summary judgment regarding: (1) the appropriate measure of damages for the loss of the boat; (2) the availability of a cause of action for breach of the duty of good faith and fair dealing under maritime law; (3) the Rocques' fraudulent and negligent misrepresentation claims; and (4) the availability of punitive damages.

### I. FACTUAL BACKGROUND

Edgecomb Boat Works is a full-service boatyard offering launching and hauling services and mechanical repairs to vessels ranging from five to 45 feet. Michael Mayne started Edgecomb Boat Works in 1986 and operated it until October 2015

when he sold it to Defendant Mitchell Garey. Before Mayne sold the business, Edgecomb Boat Works had made substantial restorations on the Rocques' vessel, a 37-foot Egg Harbor Deluxe Cruiser built in 1970, and provided annual maintenance on the vessel for eight or nine seasons.

In October 2015, Edgecomb Boat Works hauled the Rocques' vessel out of the water, winterized its engines, and stored the vessel inside its facility, pursuant to an oral agreement with Arthur Rocque. At some point, Rocque and Garey discussed the work that Rocque wanted performed on the vessel in preparation for the 2016 boating season. Thereafter, Edgecomb Boat Works' chief mechanic discovered that the vessel's two shaft logs required replacement. Shaft logs are permanently affixed to the hull of a motor-driven vessel and contain stuffing boxes, which seal water out from the propeller shaft. Within a week of learning of the issue with the shaft logs, Rocque came to Edgecomb Boat Works to inspect the shaft logs and agreed that they needed to be replaced.

Garey attempted to find replacement shaft logs, but because of the age of the vessel, he could not find any.[1] During the week of April 18, 2016, Rocque and Garey had multiple conversations regarding Garey's lack of success in finding used parts, and the conversation turned to the possibility of fabricating replacement shaft logs. Garey stated that while Edgecomb's chief mechanic had never done a fiberglass

---

[1] The Rocques assert that replacement bronze shaft logs were available. They rely on an affidavit of a certified marine surveyor, who explains that the original manufacturer of the *Against the Wind*'s shaft logs, at least at the time of the affidavit, had "[e]xact bronze replacements for the originals . . . currently available" and that "pre-fabricated sections of fiberglass shaft log pipe" are available today from a Maine supplier as substitutes. ECF No. 69 ¶¶ 4–5.

2

rebuild of shaft logs on a wooden boat, he had done it on many fiberglass boats. Rocque authorized Edgecomb to repair the shaft logs on the condition that Mayne (the former owner of Edgecomb Boat Works) be consulted and kept abreast of the repairs. Edgecomb's chief mechanic then fabricated two shaft logs out of fiberglass and installed them in the vessel.

On June 19, 2016, the Rocques took delivery of their vessel at Edgecomb Boat Work's boatyard. The Rocques attempted to bring the vessel back to its usual mooring in Stonington but were forced to return to the boatyard due to electrical problems. The next day, the Rocques brought the vessel to its mooring in Stonington. The vessel remained there until it sank, unattended, on June 24, 2016. The Rocques contend that Edgecomb's failure to properly repair the shaft logs caused progressive flooding which resulted in the sinking and total loss of the vessel.

## II. LEGAL ANALYSIS

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if "its existence or nonexistence has the potential to change the outcome of the suit." *Rando v. Leonard*, 826 F.3d 553, 556 (1st Cir. 2016) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). Issues are considered genuine "if the evidence of record permits a rational factfinder to resolve [the issue] in favor of either party . . . ." *Id.* (quoting *Borges*, 605 F.3d at 4). The facts in the record are construed in the light most favorable to the nonmoving party, and all reasonable inferences are resolved in

the nonmoving party's favor. *See Braga v. Genlyte Group, Inc.*, 420 F.3d 35, 38 (1st Cir. 2005).

## A. The Measure of Damages

Edgecomb moves for summary judgment on the measure of damages, contending that the so-called "total loss rule" limits the damages the Rocques may seek. The total loss rule provides that "where a vessel is adjudged a complete loss, the damages will be derived by calculating the vessel's value and deducting therefrom [any] salvage proceeds." *DiMillo v. Sheepscot Pilots, Inc.*, 870 F.2d 746, 752 (1st Cir. 1989) (citing *The Anna Maria*, 15 U.S. 327, 335 (1817)); *see also The Umbria*, 166 U.S. 404, 421 (1897). Accordingly, under the total loss rule, a plaintiff may not also recover damages for lost profits or loss of use of the vessel. *See A & S Transp. Co. v. Tug Fajardo*, 688 F.2d 1, 2 (1st Cir. 1982); *Rev-Lyn Contracting Co. v. Patriot Marine, LLC*, 760 F. Supp. 2d 162, 169 (D. Mass. 2010). Here, it is undisputed that the vessel sank and became a total loss. Edgecomb therefore argues that the damages the Rocques may seek are limited to the vessel's pre-casualty value less salvage. The Rocques respond that the total loss rule is specific to maritime torts and does not apply to claims sounding in contract. Because they assert claims arising out of their verbal ship repair contract with Edgecomb in addition to their tort claims,[2] the

---

[2] The Rocques are entitled to assert a claim for breach of an oral contract, as "it is an established rule of ancient respectability that oral contracts are generally regarded as valid by maritime law." *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961); *accord FSS, Inc. v. W-Class Yacht Co.*, No. 1:16-CV-300-GZS, 2018 WL 953337, at *13 (D. Me. Feb. 20, 2018). They are also entitled to simultaneously assert contract- and tort-based claims against Edgecomb under maritime law. *See La Esperanza de P.R., Inc. v. Cia. de P.R.*, 124 F.3d 10, 16 (1st Cir. 1997); *see also Gilfillan v. Cheely*, No. 2:18-CV-339-RBS-DEM, 2018 WL 6072459, at *4 (E.D. Va. Oct. 18, 2018), *adopted by*, 2018 WL 6072002 (E.D. Va. Nov. 20, 2018).

4

Rocques argue that they are entitled to seek contract damages, which are not limited by the total loss rule.

At least two courts have found that, as the Rocques argue, the total loss rule does not limit damages for breach of a ship repair contract. In *Crowley Marine Services, Inc. v. Vigor Marine LLC*, 17 F. Supp. 3d 1091 (W.D. Wash. 2014), the court thoroughly examined the issue and concluded that in "a non-towing case where there was a contract, and the contract did not expressly exclude consequential damages or limit damages to the [total loss] rule[,] . . . contract law applies to maritime contracts, to the exclusion of tort rules." *Id.* at 1096–97. Thus, the court declined to limit the liability of a ship repairer to the damages that would be available in a tort case under the total loss rule. *Id.* at 1097.

Likewise, in *Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401 (5th Cir. 1982), the defendants argued on appeal that the trial court should have limited their damages under contract law to those available under tort law by arguing that the vessel was a constructive total loss.[3] *Id.* at 415. But the Fifth Circuit flatly rejected that line of argument, explaining that "discussion of the defendants' constructive total loss argument[] would serve no useful purpose[] because . . . the district court properly applied a contractual rather than a tort measure of damages." *Id.* The *Todd* court thus concluded that the total loss rule does not limit damages in

---

[3] "[A] constructive total loss occurs when the cost of repairing the ship is greater than its fair market value immediately before the casualty." *DiMillo*, 870 F.2d at 751. Regardless of whether the vessel is a total loss or a constructive total loss, the "same principles of recovery and damages apply." 2 Thomas J. Schoenbaum. Admiralty & Maritime Law § 14:7 (6th ed. 2019).

5

contract cases such as this one. *See id.* at 412. It also emphasized that tort damages are typically applied in "classic cases" where "parties unknown to each other come into contact and one comes away damaged, such as collision cases and other maritime torts." *Id.*

The three cases Edgecomb cites in support of applying the total loss rule are readily distinguishable. In the first, *Sailor Inc. F/V. City of Rockland*, 324 F. Supp. 2d 197 (D. Me. 2004), *aff'd on other grounds,* 428 F.3d 348 (1st Cir. 2005), the plaintiff brought claims for breach of contract and negligence and sought damages for lost profits and consequential damages. *Id.* at 199. The *Sailor* court granted the defendant's motion for partial summary judgment, finding that the vessel was a constructive total loss and limiting damages to the vessel's fair market value. *Id.* at 203. Although the case included a breach of contract claim, the plaintiff waived any argument that the total loss rule was inapplicable. *See* Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 1, *Sailor Inc. F/V. City of Rockland*, 324 F. Supp. 2d 197 (D. Me. 2004) (No. 2:03-cv-261), ECF No. 11 *(*"The parties disagree on the issue of whether or not this vessel was a constructive total loss, thereby precluding the owner of the vessel from seeking lost profits."). By contrast, the Rocques have pressed, not waived, the same argument.

In the second case Edgecomb cites, *Galapagos Corporacion Turistica "Galatours," S.A. v. Panama Canal Commission*, 190 F. Supp. 2d 900 (E.D. La. 2002), the plaintiff had no contract with the defendant and brought no contract claims against it. *See id.* at 906. As such, the court did not address the question presented

6

here, namely, whether the total loss rule should apply where the parties have a ship repair contract.

In the third case Edgecomb cites, *A & S Transportation Co. v. Tug Fajardo*, 688 F.2d 1 (1st Cir. 1982), the First Circuit affirmed the district court's application of the total loss rule despite the presence of a contract. The contract there, however, was a towing contract, which courts have specifically treated in the same way as collision cases for purposes of the total loss rule. *See id.* at 2–3; *Crowley*, 17 F. Supp. 3d at 1096. Here, the contract is not one for towing, but rather ship repair.

Thus, Edgecomb does not provide a compelling reason to depart from *Crowley* and *Todd*. Mindful of the First Circuit's recent instruction "against extending [the total loss rule] to new ground," *Sawyer Bros. Inc. v. Island Transporter, LLC*, 887 F.3d 23, 36 (1st Cir. 2018), I conclude that the total loss rule does not limit the damages the Rocques may seek for claims arising out of their oral ship repair contract with Edgecomb. Accordingly, I deny summary judgment as to that issue.[4]

## B. Breach of the Duty of Good Faith and Fair Dealing Under Maritime Law

Edgecomb also seeks summary judgment on Count Three of the Rocques' complaint, which alleges a breach of the implied duty of good faith and fair dealing. Edgecomb first argues that Maine law does not recognize that duty in these

---

[4] Because I find that the Rocques' damages are not limited to those available under tort law, I need not address their alternative argument that the present case falls within the exception to the total loss rule that applies where the vessel's fair market value is not ascertainable. *See Sawyer Bros.*, 887 F.3d at 32 ("If fair market value cannot be determined, courts may resort to alternative measures of damages."); *see also N. Voyager Ltd. P'ship v. Thames Shipyard & Repair Co.*, No. CIV.A. 99-12243-RWZ, 2005 WL 1631065, at *1 (D. Mass. July 8, 2005) ("Replacement cost as the measure of damages has been held to be appropriate when the market did not value the vessel's use for the specialized purpose." (citing *King Fisher Marine Serv., Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1187 (5th Cir. 1984))).

7

circumstances. The Rocques respond that their claim sounds not in Maine law but in maritime law, which does recognize such a duty.

The Rocques are correct that, in general, "[e]very maritime contract imposes an obligation of good faith and fair dealing between the parties in its performance and enforcement." *F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1359 (S.D. Fla. 2007) (collecting cases), *aff'd,* 308 F. App'x 389 (11th Cir. 2009); *see also Spooner v. Multi Hull Foiling AC45 Vessel "4 Oracle Team USA,"* No. 15-cv-00692-JCS, 2015 WL 4748984, at *10 (N.D. Cal. Aug. 10, 2015) ("There is no question that such a duty applies to admiralty contracts." (citing *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 913 (9th Cir. 2003))). However, as Edgecomb points out, maritime law is silent as to whether a plaintiff may allege a breach of the duty of good faith and fair dealing as an independent cause of action. *See BVI Marine Constr. Ltd. v. ECS-Florida, LLC*, No. 12-80225-CIV, 2013 WL 6768646, at *6 (S.D. Fla. Dec. 20, 2013) ("[T]here appears to be no maritime rule with respect to this issue."); *cf. Egan Marine Corp. v. Great Am. Ins. Co. of New York*, No. 05 C 5295, 2010 WL 5387611, at *17 (N.D. Ill. Dec. 21, 2010) ("There is no controlling authority that admiralty law provides an independent tort claim for breach of a duty of good faith and fair dealing in connection with a maritime insurance policy."), *aff'd,* 665 F.3d 800 (7th Cir. 2011).

Where federal maritime law is silent, state law may supplement it. *See Fairest-Knight v. Marine World Distribs., Inc.*, 652 F.3d 94, 98 (1st Cir. 2011). Thus, I look to Maine law to determine whether the Rocques can assert an independent cause of action for breach of the duty of good faith and fair dealing. Under Maine

8

law, "[t]he duty to act in good faith and deal fairly . . . would provide parameters for measuring whether [a party] breached its duties under the contract but [does] not provide an independent cause of action." *Curran v. Camden Nat'l Corp.*, 477 F. Supp. 2d 247, 261 n.14 (D. Me. 2007) (citations omitted); *see also Am. Aerial Servs., Inc. v. Terex USA LLC*, No. 2:12-cv-00361-GZS, 2013 WL 1898535, at *3 (D. Me. Mar. 6, 2013), *adopted by,* 2013 WL 1898533 (D. Me. May 7, 2013). Indeed, the Maine Law Court has explicitly "declined to recognize such an independent action." *Chartier v. Farm Family Life Ins. Co.,* 113 A.3d 234, 237 (Me. 2015). Accordingly, I conclude that while the alleged breach of the duty of good faith and fair dealing may inform the Rocques' claim for breach of contract, it cannot stand as an independent cause of action. *See also BVI Marine*, 2013 WL 6768646, at *6 (applying Florida law to a claim under maritime law for breach of the implied covenant of good faith and fair dealing and reaching the same result). I therefore grant Edgecomb's motion for summary judgment as to Count Three.

## C. Fraudulent and Negligent Misrepresentation Claims

Edgecomb next seeks summary judgment on the fraudulent and negligent misrepresentation claims asserted in Counts Five and Six of the Rocques' complaint.

I apply the standards set forth in the Restatement (Second) of Torts to both claims.[5] As to fraudulent misrepresentation, the Restatement provides:

---

[5] There is a split of authority as to whether state law or maritime law applies to the misrepresentation claims. *Compare Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co.*, 436 F.3d 349, 354–55 (3d Cir. 2006) (concluding that misrepresentation claim was a maritime tort since the injury occurred on navigable water, and collecting cases, including *Florio v. Olson*, 129 F.3d 678, 680 (1st Cir. 1997)), *rev'd on other grounds,* 549 U.S. 422 (2007)*, with Smith v. Mitlof*, 198 F. Supp. 2d 492, 500–01 (S.D.N.Y. 2002) (concluding that misrepresentation claim was not a maritime tort since the misrepresentation occurred on land). *See generally Reed & Reed, Inc. v. Weeks Marine, Inc.*, 335 F.

9

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

Restatement (Second) of Torts § 525 (1977). As to negligent misrepresentation, the Restatement provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552.

Edgecomb contends that the Rocques' claims for both fraudulent and negligent misrepresentation must fail because there is no evidence that it misrepresented any fact upon which the Rocques relied. The Rocques assert that Edgecomb negligently and/or fraudulently misrepresented that it (1) could do the repair work authorized by Arthur Rocque in a competent fashion and (2) would consult the former boatyard

---

Supp. 2d 110, 121 & n.10 (D. Me. 2004). However, because I have determined that the Restatement governs fraudulent and negligent misrepresentation claims under both Maine law and maritime law, I do not address this issue. *See Lobegeiger v. Celebrity Cruises, Inc.*, No. 11-21620-CIV, 2011 WL 3703329, at *13 (S.D. Fla. Aug 23, 2011) (fraudulent misrepresentation under maritime law); *Cianchette v. Cianchette*, 209 A.3d 745, 752–53 (Me. 2019) (fraudulent misrepresentation under Maine law), *cert. denied,* 205 L. Ed. 2d 273 (Nov. 4, 2019); *Balaschak v. Royal Caribbean Cruises, Ltd.*, No. 09-21196-CIV, 2010 WL 457137, at *3 n.3 (S.D. Fla. Feb. 4, 2010) (negligent misrepresentation under maritime law); *Somarelf v. Am. Bureau of Shipping*, 704 F. Supp. 59, 63–64 (D.N.J. 1988) (negligent misrepresentation under maritime law); *Rand v. Bath Iron Works Corp.*, 832 A.2d 771, 774 (Me. 2003) (negligent misrepresentation under Maine law).

owner, Michael Mayne, about the repair work.[6] I address each of the alleged misrepresentations in turn.

### 1. Alleged Assurances of Competence

In asserting their fraudulent and negligent misrepresentation claims, the Rocques rely first on statements made by Edgecomb's owner, Mitch Garey. It is undisputed that Garey agreed to replace the shaft logs on the Rocques' wooden vessel and stated that Edgecomb's chief mechanic "had never done a fiberglass rebuild of the shaft logs on a wooden boat [but] had done it on many fiberglass boats." ECF No. 73 at 6 ¶ 29. The Rocques contend, and I agree, that Garey represented through these statements that Edgecomb was competent to replace the shaft logs on their vessel. In doing so, Garey implicitly represented that he believed the chief mechanic's skills and experience in replacing shaft logs on fiberglass vessels would apply to the Rocques' wooden vessel.

Edgecomb asserts that the Rocques cannot establish that such a representation was a misrepresentation because there is no evidence that Edgecomb lacked the skills necessary to properly replace the shaft logs on the Rocques' wooden vessel. However, the undisputed fact that the Rocques' vessel sank shortly after the repairs were completed could permit a reasonable jury to conclude that Edgecomb

---

[6] Edgecomb notes that Arthur Rocque stated during his deposition that he based the fraudulent misrepresentation claim "on an invoice submitted after the vessel sank." ECF No. 64 at 8. The Defendants correctly argue that the "invoice cannot form the basis for any misrepresentation claim, based on negligence or fraud, because Mr. Rocque has admitted that [the] Plaintiffs did not rely on this representation and took no action to their detriment based on this invoice." *Id.* at 9.

11

was incompetent to perform the repairs, and thus that Garey's representation was in fact a misrepresentation.

Edgecomb further argues that even if Garey's statement constituted a misrepresentation, the Rocques cannot establish that Garey knew that it was a misrepresentation, as required to prove fraudulent misrepresentation. To survive summary judgment, the Rocques must point to evidence sufficient for a reasonable jury to find that Garey knew the chief mechanic's skills in repairing fiberglass vessels would not apply to the repair of the Rocques' wooden vessel. *See* Restatement (Second) of Torts § 526. Such knowledge could be demonstrated by direct evidence, such as testimony from Garey to that effect. It could also be demonstrated by circumstantial evidence, such as evidence that Garey knew of prior unsuccessful repairs on wooden boats or expert testimony that anyone in the vessel repair industry would know that such skills were not transferrable because of significant differences between fiberglass and wooden vessels. *See id.*, comments (c–d). Alternatively, the Rocques must point to evidence sufficient for a reasonable jury to find that Garey knew Edgecomb was otherwise incompetent to perform the repairs. Because the Rocques have not put forth any such evidence, I grant summary judgment as to the fraudulent misrepresentation claim to the extent it is based on Edgecomb's assurances of competence.

As to the negligent misrepresentation claim, Edgecomb asserts that the Rocques cannot establish that Garey failed to exercise reasonable care in assuring

them of Edgecomb's competence to perform the repairs.  The Restatement explains the reasonable care standard, in pertinent part, as follows:

> When the information concerns a fact not known to the recipient, he is entitled to expect that the supplier will exercise that care and competence in its ascertainment which the supplier's business or profession requires and which, therefore, the supplier professes to have by engaging in it.  Thus the recipient is entitled to expect that such investigations as are necessary will be carefully made and that his informant will have normal business or professional competence to form an intelligent judgment upon the data obtained.

Restatement (Second) of Torts § 552.  Neither party asserts that Garey, or anyone else at Edgecomb, investigated the transferability of the chief mechanic's skills in repairing fiberglass vessels before agreeing to repair the Rocques' wooden vessel. And the Rocques point to evidence showing that Edgecomb had limited experience repairing wooden vessels.  They point out that Garey had, for example, "never performed any wooden vessel repairs," or "asked a single question" of Michael Mayne about how to perform any of Edgecomb's services before purchasing the boatyard. ECF No. 77 ¶ 9.  Though Edgecomb points out that its chief mechanic had 25 years of experience in vessel repair, including two-and-a-half years at a wooden vessel company, it is undisputed that the chief mechanic had never replaced the shaft logs on a wooden vessel.  This undisputed fact, combined with the evidence of Edgecomb's lack of expertise in repairing wooden vessels generally and the absence of any investigation into how repairing wooden vessels differs from repairing fiberglass or other types of vessels, could permit a reasonable jury to find that Garey failed to exercise reasonable care in representing that Edgecomb was competent to repair the Rocques' wooden vessel.  Thus, I deny summary judgment as to the Rocques'

negligent misrepresentation claim to the extent it is based on Edgecomb's assurances of competence.

### 2. Edgecomb's Agreement to Consult with Mayne

As to the second alleged misrepresentation, the parties agree that Arthur Rocque authorized Edgecomb to repair the vessel's shaft logs "on the condition that Mike Mayne, the former owner of Edgecomb Boat Works, be consulted and kept abreast of the repairs." ECF No. 73 at 6 ¶ 30. As such, there is no dispute that Edgecomb agreed to consult Mayne in the course of performing the repairs at issue. Under the Restatement, a "representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." Restatement (Second) of Torts § 530.

The Rocques assert that Edgecomb never intended to consult Mayne. They rely on an affidavit by Mayne indicating that Edgecomb did not attempt to consult him and even evaded his efforts to be involved in the repairs. Specifically, according to Mayne's affidavit, Edgecomb never contacted Mayne about the repairs, and he learned that the Rocques wanted him to be involved in the repairs directly from Arthur Rocque. Mayne avers that he agreed to honor Arthur Rocque's request but that when he visited the boatyard, Garey and the chief mechanic indicated that he was "clearly not welcome" and did not communicate with him about the repairs. ECF No. 70 at 2 ¶ 6. He further avers that no one from Edgecomb updated him on the status of the repairs or asked him to return to the boatyard thereafter.

14

Edgecomb agrees that Arthur Rocque contacted Mayne about the repairs before Edgecomb did and that Mayne visited the boatyard. However, Edgecomb asserts that Mayne was unwilling to consult on the repair work, pointing to Garey's deposition testimony that Mayne stated he "didn't want to be involved" and was only visiting the boatyard "so he could tell [Arthur Rocque] he had been there." ECF No. 57-4 at 20. Edgecomb further asserts that it nevertheless attempted to consult with Mayne, pointing to its chief mechanic's deposition testimony that he "told [Mayne] the procedures" Edgecomb was using and explained how Edgecomb planned to repair the Rocques' vessel. ECF No. 57-5 at 8. According to the chief mechanic's testimony, Mayne simply responded, "okay." *Id.*

Which of these competing narratives will ultimately prevail depends on credibility determinations by the finder of fact. Because "it is well-settled that a judge must not engage in making credibility determinations . . . at the summary judgment stage," I conclude that the Rocques have raised a genuine dispute of fact as to whether Edgecomb actively avoided consulting Mayne. *Town of Westport v. Monsanto Co.*, 877 F.3d 58, 66 (1st Cir. 2017) (quoting *Pina v. Children's Place*, 740 F.3d 785, 802 (1st Cir. 2014)). This dispute is material to the fraudulent misrepresentation claim because the evidence set forth by the Rocques, if believed, could permit a reasonable jury to find that Edgecomb never intended to consult Mayne and thus fraudulently misrepresented its intention to do so. The same dispute is also material to the negligent misrepresentation claim because the same evidence could permit a reasonable jury to find that Garey made a representation he believed to be true "but

which because of negligent expression states what is false." Restatement (Second) of Torts § 528.

I therefore deny summary judgment as to both the fraudulent and negligent misrepresentation claims to the extent they are based on Edgecomb's agreement to consult Mayne about repairing the Rocques' vessel.

## D. Punitive Damages

Lastly, Edgecomb challenges Count I of the Plaintiffs' Counterclaim,[7] which asserts a claim for punitive damages stemming from the allegedly "grossly negligent, intentional, deliberate and/or wantonly reckless conduct" of Edgecomb. ECF No. 33 at 6. Edgecomb argues that (1) punitive damages constitute a remedy, not a separate and distinct cause of action and therefore that Count I of the Counterclaim cannot stand, and (2) to the extent that the Plaintiffs seek punitive damages as a remedy, the Defendants are entitled to summary judgment.

### 1. Punitive Damages as an Independent Claim

The First Circuit has explained that "[p]unitive damages . . . do not constitute a separate cause of action, but instead form a *remedy* available for some tortious or otherwise unlawful acts." *S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 64 (1st Cir. 2000) (emphasis in original); *Redmond v. Yachting Sols., LLC*, No. 2:17-CV-292-GZS, 2018 WL 1075030, at *2 (D. Me. Feb. 27, 2018) ("[A] party may seek punitive damages in an admiralty action [only] where the punitive damages are

---

[7] I note that while Fed. R. Civ. P. 7 permits a plaintiff to file a counterclaim in an answer to a counterclaim or in a reply, better practice here would call for an amendment to the complaint. *See* 5 Wright & Miller, Fed. Prac. & Proc. Civ. § 1188 (3d ed. 2019).

sought based on a separate, self-sufficient claim . . . ."); *see also Fiacco v. Sigma Alpha Epsilon Fraternity*, 484 F. Supp. 2d 158, 177 (D. Me. 2007) (same under Maine law), *aff'd,* 528 F.3d 94 (1st Cir. 2008). Moreover, most of the Rocques' other claims already seek punitive damages as a remedy. *See* ECF No. 1.[8] I therefore grant summary judgment to Edgecomb as to the Plaintiffs' punitive damages counterclaim.

### 2. Punitive Damages as a Remedy

Edgecomb also argues that punitive damages are unavailable as a remedy because the Rocques have not set forth evidence indicating that its actions were "intentional, deliberate or so wanton and reckless as to demonstrate a conscious disregard of the rights of others," as required to establish that punitive damages are warranted. ECF No. 64 at 11–12 (quoting *CEH, Inc. v. F/V Seafarer*, 70 F.3d 694, 702 (1st Cir. 1995)). However, I have already determined that there is a genuine dispute of material fact as to whether Edgecomb fraudulently misrepresented its intention to consult Mayne in the course of repairing the Rocques' vessel. For the same reasons, I conclude that there is a genuine dispute as to whether Edgecomb engaged in "intentional" or "deliberate" conduct demonstrating "a conscious disregard for the rights of others." *CEH, Inc.*, 70 F.3d at 702. Accordingly, I deny summary judgment as to the availability of punitive damages for the fraudulent misrepresentation claim asserted in Count Five of the Rocques' complaint. I defer

---

[8] Counts Five (Fraudulent Misrepresentation) and Eight (Common Law Negligence) of the Rocques' complaint do not contain a prayer for relief. These omissions appear to be scrivener's errors given that the Rocques have included a prayer for relief, including a request for punitive damages, for every other cause of action. Further, the parties' memoranda treat these claims as if they were requesting such relief. I analyze the claims accordingly.

ruling on the availability of punitive damages as to the remaining claims until after trial on the fraudulent misrepresentation claim. *See Ellenwood v. Exxon Shipping Co.*, 984 F.2d 1270, 1284 (1st Cir. 1993) (holding that, "when the jury specifically has rejected plaintiffs' . . . intentional tort claims," punitive damages are unavailable as to the plaintiffs' maritime contract claims).

### III.  CONCLUSION

For the reasons stated above, it is **ORDERED** that the Defendants' Motion for Partial Summary Judgement (ECF No. 64) is **GRANTED IN PART** as to Count Three of the Plaintiffs' Complaint (Breach of the Duty of Good Faith and Fair Dealing), as to Count Five of the Plaintiffs' Complaint (Fraudulent Misrepresentation) to the extent it arises out of the Defendants' statement about their repair capabilities, and as to Count One of the Plaintiffs' Counterclaim (Independent Claim for Punitive Damages). In all other respects, the Motion is **DENIED**.

In addition, the Plaintiffs have moved to amend their opposing statement of facts to add a handful of previously omitted citations. The Defendants have not objected. I have considered the amended statement of facts in resolving the present motion for partial summary judgement. It is therefore **ORDERED** that the Plaintiffs' Motion to Amend *Opposing Statement of Fact* (ECF No. 78) is **GRANTED**.

**SO ORDERED.**

**Dated this 27th day of April, 2020.**

                                                                        **/s/ JON D. LEVY**
                                                **CHIEF U.S. DISTRICT JUDGE**